# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DOUGLAS TANKERSLEY,**     **:**
     **:**
    **Plaintiff,**     **:**
     **:**     **CIVIL ACTION FILE NO.**
**v.**     **:**     **1:17-cv-00140-AJB**
     **:**
**COMMISSIONER, SOCIAL**     **:**
**SECURITY ADMINISTRATION,**     **:**
     **:**
    **Defendant.[1]**     **:**

# <u>O R D E R   A N D   O P I N I O N</u>[2]

Plaintiff Douglas Tankersley ("Plaintiff") brought this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration ("the

---

[1]    Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 1/13/17). Therefore, this Order constitutes a final Order of the Court.

Commissioner") denying his application for Disability Insurance Benefits ("DIB")

under the Social Security Act.[3] For the reasons below, the undersigned **REVERSES**

the final decision of the Commissioner **AND REMANDS** the case to the

Commissioner for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 6, 2013, alleging disability

commencing on January 1, 2010.  [Record (hereinafter "R") 182].  Plaintiff's

application was denied initially and on reconsideration.  [*See* R81-110].  Plaintiff then

requested a hearing before an Administrative Law Judge ("ALJ").  [R122-23].  An

---

[3]    Title II of the Social Security Act provides for federal Disability Insurance Benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled ("SSI").  Title XVI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

AO 72A
(Rev.8/8
2)

evidentiary hearing was held on April 2, 2015. [R41-80]. The ALJ issued a decision on June 26, 2015, denying Plaintiff's application on the ground that he had not been under a "disability" from the alleged onset date through the date of the decision. [R21-40]. Plaintiff sought review by the Appeals Council and amended the alleged onset date to February 1, 2013. [R283-90]. The Appeals Council denied Plaintiff's request for review on December 2, 2016, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then initiated action in this Court on January 12, 2017, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on May 24, 2017. [*See* Docs. 6, 7]. On June 23, 2017, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 10]; on July 24, 2017, the Commissioner filed a response in support of the decision, [Doc. 11]; and on August 1, 2017, Plaintiff filed a reply brief in support of his petition for review, [Doc. 12]. Court-ordered oral argument took place on March 15, 2018. [Doc. 15]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

AO 72A
(Rev.8/8
2)

## II.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001);

AO 72A
(Rev.8/8
2)

*Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. § 404.1520(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

5

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. § 404.1520(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III. SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the

6

Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of

7

legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007). In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id.* at 1262. This means that the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id.* at 1266-67 (quoting 20 C.F.R. § 404.970(b)).

## IV. STATEMENT OF FACTS[4]

### A. Background

Plaintiff was born on February 22, 1961, [R81], and therefore was fifty-one years old on the amended alleged onset date, [R284], and was fifty-four years old when the ALJ issued her adverse decision, [R35]. He has a GED, [R223], and past work as a letter carrier, postal clerk, and custodian, [R49, 72-73, 223]. He alleges disability

---

[4] In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 10-12].

AO 72A
(Rev.8/8
2)

due to heart disease, coronary artery disease, atherosclerosis,[5] degenerative joint disease, hypertension, herniated discs, status post cervical fusion, generalized anxiety disorder, panic attacks, and bipolar disorder. [R45, 222].

B.   *Lay Testimony*

In his testimony before the ALJ, Plaintiff stated that he had physical therapy when his back first started bothering him, but when he did not see any improvement over a course of about three months, he was referred to pain management. [R58]. He reported that he still had pain in his neck, left shoulder, and lower left back near the tailbone, radiating almost to the knee, [R58-59], and that his medications included

---

[5]     Atherosclerosis is characterized by irregularly distributed lipid deposits in the innermost portions of large- and medium-sized arteries. The deposits block blood flow. *PDR Med. Dictionary* 162 (1st ed. 1995).

Percocet,[6] Klonopin,[7] Neurontin,[8] Niravam,[9] Lexapro,[10] Coreg,[11] and Benicar,[12]

---

[6]     Percocet is a combination of oxycodone and acetaminophen and is a narcotic analgesic used to relieve moderate-to-severe pain. MedlinePlus, Oxycodone, https://medlineplus.gov/druginfo/meds/a682132.html (last visited 3/26/18).

[7]     Klonopin (clonazepam) is a benzodiazepine that is used to control certain types of seizures and to relieve panic attacks. MedlinePlus, Clonazepam, https://medlineplus.gov/druginfo/meds/a682279.html (last visited 3/26/18).

[8]     Neurontin (gabapentin) is an anticonvulsant medication that is often used to relieve nerve pain. MedlinePlus, Gabapentin, https://medlineplus.gov/druginfo/meds/a694007.html (last visited 3/5/18).

[9]     Niravam (alprazolam) is a benzodiazepine typically used to treat anxiety disorders and panic disorder. Medline Plus, Alprazolam, https://medlineplus.gov/druginfo/meds/a684001.html (last visited 3/26/18).

[10]     Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. It is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs) and works by increasing the amount of serotonin in the brain. MedlinePlus, Escitalopram, https://medlineplus.gov/druginfo/meds/a603005.html (last visited 3/26/18).

[11]     Coreg (carvedilol) is a beta blocker. It is used to treat heart failure and high blood pressure and is also used to treat people who have had a heart attack. It works by relaxing the blood vessels and slowing the heart rate to improve blood flow and decrease blood pressure. MedlinePlus, Carvedilol, https://medlineplus.gov/druginfo/meds/a697042.html (last visited 3/26/18).

[12]     Benicar (olmesartan) is in a class of medications called angiotensin II receptor antagonists and is used to treat high blood pressure. It works by blocking the action of certain natural substances that tighten the blood vessels, allowing the blood to flow more smoothly and the heart to pump more efficiently. MedlinePlus, Olmesartan, https://medlineplus.gov/druginfo/meds/a603006.html (last visited 3/26/18).

AO 72A
(Rev.8/8
2)

[R53, 56-57]. He indicated that the pain in his back was generally constant and that any physical activity made his pain worse. [R68]. He stated that without medication, his low-back pain was at eight on a ten-point scale and his shoulder pain was at about four or five; that with medication, his lower-back pain was at five; and that medication did not really affect the pain in his shoulder. [R60]. He also indicated that ice on his lower back and sitting with a pillow behind his back could take the lower-back pain away for sometimes thirty minutes or longer. [R60-61]. Plaintiff further stated that he had received relief from epidural injections but that they had become less effective over time. [R53]. He also indicated that a C5-C7 cervical discectomy[13] and fusion surgery he had in 2014 relieved some of his shoulder pain but that he was still recovering. [R52-53, 61].

Plaintiff testified that he had retired from the postal service at the end of January 2013. [R47, 69]. He stated that his back was causing him so much pain that he was unable to do the custodial work he was assigned to do. [R69]. The postmaster who was there at the time had assigned a temporary employee to do Plaintiff's custodial work and allowed Plaintiff to do things for her like filing. [R69]. When that

---

[13]     A discectomy is the "[e]xcision, in part or whole, of an intervertebral disk." *PDR Med. Dictionary* 491 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

postmaster was leaving, Plaintiff took the opportunity to accept early retirement because he was afraid he would lose his job and not have anything. [R69-70].

Plaintiff described himself as "pretty much sedentary," stated that just about any kind of physical activity made his pain worse, and indicated that he did not do much because he was physically unable to do much. [R62]. He reported that he could walk for about ten minutes and stand for about fifteen minutes; that he is in pain when he sits for about thirty-five minutes in church; that the surgeon told him not to lift anything heavier than a gallon of milk after his surgery; and that he avoided bending "at all costs." [R62-64, 67]. He also indicated that he did not have problems with personal care or dressing except for putting on his shoes, which required bending. [R64].

Plaintiff stated that he could not clean his house completely and would do things like wash dishes or put them into the dishwasher in spurts—he would perform the activity and then sit for a while until the pain subsided. [R62]. He reported that he watched television sometimes and read a lot of books, [R62], and could use a microwave oven, cook things like pasta and frozen vegetables on the stove top, shop for groceries approximately every two weeks, do laundry, fold clothing, take out the garbage, change bed linen with assistance, use a Swiffer and vacuum, attend church

12

services and Sunday school weekly, and manage his finances, [R49, 65-66]. Plaintiff testified that although he no longer owned a car, he could still drive, and he drove to the hearing in his mother's car. [R48]. He stated that he would also drive to doctor's appointments and to church on Wednesdays and Sundays. [R48].

Plaintiff indicated that he periodically has panic attacks where he shakes and gets really nervous; sometimes it happens two or three days in a row and then not for another month. [R70]. He stated that every day he has episodes where he has difficulty concentrating: he will need to read a paragraph three or four times and can hardly concentrate through an entire television show. [R68]. He also stated that he has a lot of insomnia. [R67].

### C.    Administrative Records

Plaintiff's work-history report indicates that he worked for the postal service as a letter carrier, clerk, and custodian for nearly twenty-two years, until January 31, 2013. [R214]. Earnings records show no income after 2013. [R210].

In an adult function report Plaintiff completed on July 23, 2013, he reported that he had lived alone in his house since May 15, 2013, when his wife died. [R231]. He described a typical day as awakening, having breakfast, taking medicine, icing his back, walking around the house or backyard, watching television on occasion, visiting

in person or over the phone with his mom, feeding his cats, and reading books. [R231]. He also indicated that he went to church on Sundays. [R231].

Plaintiff stated that he was able to maintain his personal care with no problem, would set his own reminders to take medicine, could do laundry, fold clothes, and put dishes in the dishwasher, could prepare sandwiches and microwavable or stove-top meals, could drive, would shop every two weeks for groceries, and could pay bills, count change, and use a checkbook, but he asked family or friends to do his yard work. [R232-34]. He indicated that he had a fear of bankruptcy and was lonely since his wife died. [R237].

In a disability report dated October 21, 2013, Plaintiff indicated that he was extremely depressed and was having a hard time coping with his anxiety. [R244]. He also stated that because stress gets to him easily and causes him to have panic attacks, he tries to do only simple tasks and to avoid complex chores. [R248].

In a report dated November 16, 2013, Plaintiff reported essentially the same activities and limitations that he had reported in July. [R257]. He also indicated that his neck was a problem, that it caused his left arm to be numb, and that he might need surgery. [R257].

14

## D. Medical Records

Plaintiff presented to Atlanta Heart Associates on July 22, 2011, for follow up on his atherosclerosis and hyperlipidemia. [R313]. It was noted that Plaintiff was doing well, with no cardiac symptoms; that he was maintaining his usual level of activity; and that he reported doing reasonably well. [R314].

Plaintiff saw Kusuma S. Rao, M.D., for psychiatric follow up on September 7, 2011. [R445-46]. Plaintiff was concerned because 3,000 postal workers had been laid off in Georgia in the last week, and he was afraid that postal jobs would vanish altogether. [R445]. Dr. Rao noted that his concern appeared justified. [R445]. Notes from the mental-status examination indicate that Plaintiff was sensitive, his facial expression was fearful, and he felt persecuted. [R445]. Dr. Rao assessed a GAF score of 80-71[14]; opined that Plaintiff's symptoms were transient reactions to psychosocial stressors; and continued Plaintiff on Lexapro. [R446-47].

---

[14] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score in the range of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.* at 34.

15

Plaintiff saw Dr. Rao for psychiatric follow up on November 2, 2011. [R443-44]. Dr. Rao noted that Plaintiff was sick with high blood pressure, had been working too much, and had to take time off work after having chest pain. [R444]. A mental-status examination was unremarkable. [R444]. Dr. Rao assessed a GAF score of 70-61[15]; opined that Plaintiff had "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R444].

Plaintiff returned Dr. Rao for psychiatric follow up on November 30, 2011. [R360-61, 442-43]. Dr. Rao noted that Plaintiff was still going through extreme stress on the job and suggested that Plaintiff consider early retirement in order to prevent stress-induced heart attacks. [R360, 442]. A mental-status examination was unremarkable. [R360-61, 443]. Dr. Rao assessed a GAF score of 80-71; opined that Plaintiff's symptoms were transient reactions to psychosocial stressors; and continued medication. [R360, 443].

Plaintiff presented to Atlanta Heart Associates on December 1, 2011, for follow up on his atherosclerosis and hyperlipidemia. [R309]. It was noted that Plaintiff was

---

[15]     A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

16

doing well, with no cardiac symptoms; that he was maintaining his usual level of activity; and that he reported doing reasonably well. [R310].

Plaintiff saw Dr. Rao for psychiatric follow up on December 29, 2011. [R359-60, 441-42]. It was noted that Plaintiff did not show any concern about possible job loss since he was open to accepting retirement at any time. [R359, 441]. A mental-status examination was unremarkable. [R359-60, 441-42]. Dr. Rao assessed a GAF score of 80-71, specified that the score indicated transient symptoms and reactions to psychosocial stressors, and continued medication. [R360, 442].

Plaintiff returned to Dr. Rao for psychiatric follow up on January 25, 2012. [R440]. Plaintiff reported that he had a few chest pains over the weekend. [R440]. Dr. Rao noted that Plaintiff was dealing with a hectic work schedule and a home-improvement project that may have taken a toll on him. [R440]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and suggested that Plaintiff try working part time until his stress cleared. [R441]. She also continued medication. [R440].

Plaintiff visited Dr. Rao on February 22, 2012. [R356, 438-39]. He stated that he was feeling better since a house repair was finished and that he did not have any

AO 72A
(Rev.8/8
2)

stress on the job since he had a conference with his supervisor. [R356, 438].

Mental-status examination was unremarkable. [R357, 439]. Dr. Rao assessed a GAF

score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but

generally functioning pretty well, conflicts"; and continued medication. [R357, 439].

Plaintiff presented to Atlanta Heart Associates on March 1, 2012, for follow up

on his atherosclerosis and hyperlipidemia. [R306]. It was noted that Plaintiff was

doing well, with no cardiac symptoms; that he was maintaining his usual level of

activity; and that he reported doing reasonably well. [R306].

Plaintiff had a lumbar-spine MRI on March 8, 2012. [R368-69]. The imaging

revealed degenerative changes, including disc desiccation and spondylosis[16] at every

level. [R368]. It was noted that Plaintiff had no significant central spinal stenosis[17]

but did have moderate-to-severe disc space narrowing at L3-L4; severe facet

---

[16]   "Spondylosis" refers to stiffening vertebra and is "often applied nonspecifically to any lesion of the spine of a degenerative nature." *PDR Med. Dictionary* 1656 (1st ed. 1995).

[17]   "Spinal stenosis" causes narrowing in the spinal canal, which in turn puts pressure on the nerves and spinal cord and can cause pain. MedlinePlus, Spinal Stenosis, https://medlineplus.gov/spinalstenosis.html (last visited 3/26/18).

AO 72A
(Rev.8/8
2)

hypertrophy[18] bilaterally at L4-5; mild-to-moderate foraminal stenosis[19] bilaterally at L4-5 and L5-S1; and small left foraminal to extra-foraminal disc bulging at L2-3 abutting the left L2 nerve root. [R368-69].

Plaintiff visited Dr. Rao on March 21, 2012, for refills of medication. [R355, 437]. He presented no new problems. [R355, 437]. Mental-status examination was unremarkable. [R355-56, 437-38]. Dr. Rao assessed a GAF score of 70-61 and specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts." [R356, 438].

Plaintiff returned to Dr. Rao for psychiatric follow up on April 18, 2012. [R354-55]. He reported that he had been unable to work for a week due to hip pain. [R354]. Dr. Rao discussed with him that because of his declining health, he might need to consider early retirement. [R354]. A mental-status examination was

---

[18]     Facet joints are situated between the stacked vertebrae and typically lie behind the spinal nerves as they emerge from the central spinal canal. The two facet joints and intervertebral disc at each level of the spine allow for motion between the vertebral bodies. KnowYourBack.org., Anatomy of the Spine (Bones), https://www.spine.org/KnowYourBack/Resources/AnatomySpine (last visited 3/26/18). "Hypertrophy" refers to abnormal enlargement. J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* H-258, J-19-20 (46th ed. 2012).

[19]     "Foraminal stenosis" is a narrowing of a nerve opening where a nerve root leaves the spinal canal. MedlinePlus, Foraminotomy, https://medlineplus.gov/ency/article/007390.htm (last visited 3/26/18).

AO 72A (Rev.8/8 2)

unremarkable except for a fearful facial expression and agitated motor behavior. [R354]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R354].

Plaintiff presented to pain specialist Pickens A. Patterson III, M.D., on April 30, 2012, with complaints of back and leg pain. [R770]. Notes indicate that the pain started four to five months earlier; that Plaintiff presently rated the pain at eight on a ten-point scale; that the pain traveled from the low back down the left leg into the foot; and that Lortab[20] helped the pain. [R770]. Dr. Patterson scheduled Plaintiff for selective lumbar epidural steroid injections. [R770].

Dr. Patterson administered selective L2 and L5 epidural steroid injections on May 4, 2012. [R772].

Notes from Dr. Patterson's office dated May 14, 2012, indicate that Plaintiff complained of left-leg pain that he rated at eight on a ten-point scale, with nine at its worst and five at its best. [R768]. It was noted that Plaintiff was improving

---

[20] Lortab is an opioid pain medication that contains a combination of acetaminophen and hydrocodone and is used to relieve moderate-to-severe pain. Drugs.com, Lortab, http://www.drugs.com/lortab.html (last visited 3/26/18).

20

approximately fifty percent with epidural steroid injections, that Lortab was helping, and that ice packs also relieved pain. [R768].

At a visit to Dr. Rao on May 16, 2012, Plaintiff reported that he had broken his shoulder and had been on medical leave for two weeks. [R352-53, 434-35]. He was concerned about the pain in his shoulder and the length of time he had to work before retirement. [R352, 434]. Dr. Rao encouraged him to discuss earliest time of retirement if a package was offered to him. [R352, 434]. A mental-status examination was unremarkable. [R353, 435]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R353, 435].

At a visit to Atlanta Heart Associates on May 31, 2012, Plaintiff's chief complaints were anxiety, chest pain, shortness of breath, and fatigue. [R302]. He also complained of chronic low-back pain. [R302]. It was noted that Plaintiff was doing well, with no cardiac symptoms, [R302]; that he was exercising sporadically, [R303]; that he was maintaining his usual level of activity, [R304]; and that he stated he was doing reasonably well, [R304].

Plaintiff returned to Dr. Patterson with complaints of lumbar pain on June 4, 2012. [R391-92]. He reported receiving sixty- to seventy-percent relief from

21

an injection he received on May 18, 2012, but he said he had good and bad days and had trouble sleeping most nights because of pain, particularly in his left lower back. [R391]. He reported that his pain level was at five or six on a ten-point pain scale. [R391]. Examination was unremarkable. [R391-92]. Dr. Patterson assessed lumbar radiculopathy[21] and herniated disc syndrome; started Plaintiff on Lortab and Neurontin; and scheduled him for more epidural injections. [R391].

Plaintiff saw Dr. Rao for psychiatric follow-up on June 15, 2012. [R351-52]. It was noted that Plaintiff complained less of sleep and anger problems and was having fewer work absences since his pain had become tolerable. [R351]. A mental-status examination was unremarkable. [R351-52]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R351-52].

---

[21] Radiculopathy is an alternate name for a herniated (slipped) disk, which occurs when all or part of the softer center of a spinal disk is forced through a weakened part of the exterior of the disk, forming a protruding mass and placing pressure on nearby nerves. Mayo Clinic, Herniated Disk, http://www.mayoclinic.org/diseases-conditions/herniated-disk/home/ovc-20271246 (last visited 3/26/18); MedlinePlus, Herniated Disk, https://medlineplus.gov/ency/article/000442.htm (last visited 3/26/18); J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* H-115 (46th ed. 2012).

22

AO 72A
(Rev.8/8
2)

Plaintiff returned to Dr. Patterson for follow up on his lumbar pain on July 9, 2012. [R386-87]. Although he complained of pain in his left leg, his pain level that day was at one; he reported that he had some good days due to shots and was sleeping better; and he reported eighty-percent overall improvement after his third injection. [R386]. Examination was unremarkable. [R386-87]. Dr. Patterson assessed lumbar radiculopathy and herniated disc syndrome and refilled Plaintiff's Norco[22] and Neurontin. [R386].

Plaintiff visited Dr. Rao on July 13, 2012. [R350, 432]. He denied any new pain problems and reported that he was not taking early retirement. [R350, 432]. Mental-status examination was unremarkable. [R350, 432]. Dr. Rao assessed a GAF score of 80-71; specified that the score indicated transient symptoms and reactions to psychosocial stressors; and continued medication. [R351, 433].

Plaintiff returned to Dr. Patterson with complaints of lumbar pain on August 6, 2012. [R384-85]. He stated that his pain had flared earlier that week, but he rated the pain on the date of his appointment at three on a ten-point pain scale. [R384]. Examination was unremarkable. [R384-85]. Dr. Patterson assessed lumbar

---

[22]    Norco is a combination drug containing acetaminophen and hydrocodone. MedlinePlus, Hydrocodone Combination Products, https://medlineplus.gov/druginfo/meds/a601006.html (last visited 3/26/18).

23

AO 72A
(Rev.8/8
2)

radiculopathy and herniated disc syndrome; increased Plaintiff's Norco prescription and continued him on Neurontin; prescribed water therapy; and scheduled Plaintiff for more epidural injections. [R384].

Plaintiff returned to Dr. Rao for psychiatric follow-up on August 10, 2012. [R349, 431]. Plaintiff complained that his back pain caused him to miss work and stated that he feared that he might need surgery. [R349, 431]. Dr. Rao noted that Plaintiff's facial expression was fearful, his motor behavior was decreased, his mood and affect were labile,[23] and he was restless. [R349, 431]. She assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R349, 431].

Dr. Patterson administered a therapeutic lumbar transforaminal epidural injection on August 15, 2012. [R381]. It was noted that Plaintiff had been unresponsive to nonsteroidal anti-inflammatory medication and physical therapy; he had failed conservative treatment; he had experienced sixty-percent improvement for two to three weeks following the previous procedure; and the epidural was necessary

---

[23]     "Lability" refers to instability; in psychology or psychiatry, it denotes "free and uncontrolled mood or behavioral expression of the emotions." *PDR Med. Dictionary* 926 (1st ed. 1995).

24

in order to decrease pain and enable Plaintiff to better tolerate physical therapy. [R381-82].

Plaintiff returned to Dr. Rao for psychiatric follow-up on September 7, 2012. [R430]. He reported that he had gone back to work after receiving multiple spinal injections and was happy to be able to pay his bills. [R430]. He denied nightmares and insomnia, and mental examination was normal. [R430]. Dr. Rao assessed a GAF score of 70 and continued Plaintiff's medication for depression. [R430].

Plaintiff visited Dr. Patterson on September 28, 2012, with complaints of lumbar pain he rated at three to four on a ten-point scale. [R377, 379]. Examination was unremarkable, and it was noted that Plaintiff was "doing well with increased function and quality of life." [R377-79]. Dr. Patterson diagnosed lumbar radiculopathy and low-back pain and refilled Plaintiff's Lortab and Neurontin. [R379].

Plaintiff returned to Dr. Rao for psychiatric follow-up on October 5, 2012. [R429]. He denied that pain in his hip continued to cause him to be absent from work and expressed concerns about his daughter's graduation ceremony. [R429]. Mental-status examination was unremarkable except for Dr. Rao's note that Plaintiff had a sad facial expression. [R429-30]. Dr. Rao assessed a GAF score of 70-61;

AO 72A
(Rev.8/8
2)

specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R430].

Plaintiff visited Dr. Patterson on November 30, 2012, for low-back pain. [R373]. It was noted in Plaintiff's medical history that his baseline activities included walking, standing, cooking, light housework, and heavy housework but that he was unable to stand or sit for long periods, bend, or sleep. [R373]. It was also noted that Plaintiff was doing better since his last office visit; he had minimal pain in his low back, rated at three on a ten-point scale; Neurontin and Lortab were effective; and Plaintiff was receiving about seventy-percent relief. [R373]. Upon examination, it was noted that although Plaintiff had some lumbar tenderness to palpation, his gait was normal, his lumbar was unremarkable, and he had full strength and range of motion. [R373]. Dr. Patterson diagnosed lumbar radiculopathy and lumbar spondylosis without myelopathy[24] and refilled Plaintiff's Lortab and Neurontin. [R374].

Plaintiff returned to Dr. Patterson on December 28, 2012, for low-back pain. [R411, 413]. It was noted in Plaintiff's medical history that Plaintiff's baseline

---

[24] Myelopathy describes any neurologic deficit related to the spinal cord, usually due to compression of the spinal cord by disc material in the cervical spine. D.J. Seidenwurm, *American Journal of Neuroradiology*, May 2008, 29 (5) 1032-1034, *available at* http://www.ajnr.org/content/29/5/1032 (last visited 3/26/18).

AO 72A
(Rev.8/8
2)

activities included walking, standing, cooking, light housework, and heavy housework, but that Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R411, 413]. It was also noted that Plaintiff's pain was rated at five on a ten-point scale, and his Neurontin and Lortab helped his pain. [R411, 413]. Examination was unremarkable. [R411, 413]. Dr. Patterson diagnosed low-back pain and lumbar spondylosis without myelopathy and refilled Plaintiff's Lortab and Neurontin. [R411].

Plaintiff returned to Dr. Rao for psychiatric follow up on January 2, 2013. [R344-45, 590-91]. Plaintiff reported that he was upset and concerned because his wife had suddenly become sick and unable to work. [R345, 590]. His mental-status examination was unremarkable except for Dr. Rao's observations that Plaintiff's facial expression was sad and that his mood and affect were anxious. [R345, 591]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; continued medication; and noted the need for Plaintiff to cut down on stressors. [R345, 591].

A review of systems during a follow-up visit to Atlanta Heart Associates taking place on February 14, 2013, indicated anxiety and stress. [R295, 529]. Physical examination was unremarkable. [R296, 530].

Plaintiff returned to Dr. Patterson on February 22, 2013, for low-back pain. [R409]. It was noted in Plaintiff's medical history that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework, but that Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R409]. It was also noted that Plaintiff had been able to rest better with less pain since his retirement; his pain was rated at three on a ten-point scale; and his Neurontin and Lortab were effective. [R409]. Upon examination, it was noted that Plaintiff's lumbar was remarkable only for some spasm and tenderness to palpation and his gait was normal. [R409]. Dr. Patterson diagnosed low-back pain and lumbar spondylosis without myelopathy and refilled Plaintiff's Lortab and Neurontin. [R410].

Plaintiff returned to Dr. Rao on March 1, 2013. [R424]. He reported being hurt and disappointed with his daughter. [R424]. Mental-status examination was unremarkable except for notes that Plaintiff's facial expression was sad. [R425]. Dr. Rao assessed a GAF score of 60-51[25]; specified that the score indicated "[m]oderate

---

[25] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

28

AO 72A
(Rev.8/8
2)

symptoms or difficulties (few friend[s], conflict with peers)"; continued medication; and recommended that Plaintiff bring his daughter to their next session. [R425].

Plaintiff returned to Dr. Patterson on March 22, 2013, with complaints of low-back pain that was shooting down his left leg to the knee. [R407]. It was noted that Plaintiff's pain level averaged five on a ten-point scale; that it had increased with a flare over the past three days after he raked the yard; that Plaintiff was stressed with his wife's illness; and that the pain was improved by Neurontin, Lortab, and ice. [R407]. Dr. Patterson also noted that Plaintiff was starting back to work in the next month and that his baseline activities included walking, standing, cooking, light housework, and heavy housework, but that Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R407-08]. Dr. Patterson diagnosed lumbarsacral radiculopathy and noted that Plaintiff had adequate refills. [R408].

Notes from a visit to Dr. Patterson taking place on April 19, 2013, indicate that Plaintiff had low-back pain shooting down to the knee in his left leg that was at an average severity of four on a ten-point scale. [R404]. It was noted that Plaintiff's wife needed a heart transplant and that Plaintiff was under stress. [R404-05]. Plaintiff's medical history states that his baseline activities included walking, standing, cooking, light housework, and heavy housework but that he was unable to stand for long

29

periods, sit for long periods, sleep, or bend. [R404]. Examination was unremarkable. [R405]. Dr. Patterson assessed lumbar spondylosis without myelopathy and continued Neurontin and Lortab. [R405].

Plaintiff saw Dr. Rao for psychiatric follow up on May 28, 2013. [R340, 586-87]. Dr. Rao noted that Plaintiff was extremely concerned about his wife, who was in and out of the hospital. [R340, 586]. A mental-status examination was normal except for notes indicating that Plaintiff's facial expression was sad, his motor behavior was agitated, and his mood and affect were labile. [R340, 586]. Dr. Rao assessed Plaintiff with a GAF score of 60-51; specified that the score indicated "[m]oderate symptoms or difficulties (few friend[s], conflicts with peers)"; and continued medication. [R340-41, 586-87].

At a visit to Atlanta Heart Associates taking place on June 20, 2013, it was noted that Plaintiff complained of chronic back pain and was under stress due to the loss of his wife. [R292, 469, 526].

Dr. Rao completed a mental-impairment questionnaire on June 20, 2013. [R337-39]. She stated that Plaintiff's most recent mental-status examination took place on May 26, 2013, and that his orientation, affect, mood, memory, insight, judgment, and impulse control were normal, but that he appeared anxious and was preoccupied

30

with his wife's death. [R337-38]. Dr. Rao diagnosed bipolar disorder and panic attacks without agoraphobia[26] and observed that Plaintiff was "doing well on medication." [R338]. She also opined that Plaintiff had normal ability to understand, remember, and carry out simple instructions, get along with the public, supervisors, and co-workers, deal with changes in the work setting, and make simple work-related decisions; he was unlikely to decompensate or become unable to function under stress; and he was competent to handle funds. [R338-39].

Plaintiff returned to Dr. Patterson on June 21, 2013, with complaints of low-back pain that was shooting down his left leg to the knee. [R402]. It was noted that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework and that his pain was improved by Neurontin, Lortab, and ice, but that his pain averaged seven on a ten-point scale, and Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R402]. Dr. Patterson diagnosed lumbago,[27]

---

[26]     Agoraphobia is a mental disorder often associated with panic attacks. It is characterized by an irrational fear of leaving the familiar setting of home or venturing into the open. *PDR Med. Dictionary* 38 (1st ed. 1995).

[27]     "Lumbago" describes pain in the mid and lower back; the term does not specify the cause of the pain. *PDR Med. Dictionary* 998 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

lumbar spondylosis without myelopathy, and low-back pain. [R402]. He refilled Plaintiff's Neurontin and Lortab. [R403].

Plaintiff returned to Dr. Patterson on June 26, 2013, with complaints of low-back pain that was shooting down his left leg to the knee. [R400]. It was noted that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework and that his pain was improved by Neurontin, Lortab, and ice, but that his pain averaged seven on a ten-point scale and was at eight that day, and Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R400]. Dr. Patterson diagnosed lumbar spondylosis without myelopathy and injected Plaintiff's lumbar facet joints. [R400]. When contacted on June 27, 2013, Plaintiff reported that he was able to lie down without pain, sleep longer without pain, and had increased range of motion and activity level. [R400, 403].

Plaintiff returned to Dr. Patterson on July 10, 2013, with complaints of low-back pain that was shooting down his left leg to the knee. [R396]. It was noted that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework and that his pain was improved by Neurontin, Lortab, and ice, but that his pain averaged seven on a ten-point scale, and Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R396]. Dr. Patterson diagnosed lumbar

32

spondylosis without myelopathy; completed a radiofrequency ablation of the lumbosacral region[28]; and refilled Plaintiff's Lortab and Neurontin. [R396]. The treatment notes also indicate that Plaintiff's wife had died in May. [R396].

Plaintiff returned to Dr. Rao for psychiatric follow up on July 23, 2013. [R420-21, 584-85]. Dr. Rao noted that Plaintiff was unhappy because of the death of his wife, back problems that were causing physical limitations in his ability to work, and financial problems. [R420, 584]. A mental-status examination was normal. [R420, 584]. Dr. Rao assessed Plaintiff with a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R420-21, 584-85].

David E. Massey, Ph. D., reviewed the record and issued an opinion on August 2, 2013. [R86-87]. He stated that he gave controlling weight to the opinion Dr. Rao issued on June 20, 2013, and found that Plaintiff's mental impairments were not severe. [R87].

_____

[28] In this context, ablation is a procedure used to destroy the function of nerve tissue, thereby decreasing pain signals from that specific area. WebMD, Radiofrequency Ablation for Arthritis Pain, https://www.webmd.com/pain-management/radiofrequency-ablation#1-2 (last visited 3/26/18); *PDR Med. Dictionary* 3 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

Dr. Rao also completed a mental-impairment questionnaire on August 2, 2013. [R449-54]. She opined that Plaintiff was "seriously limited"—defined as having "a noticeable difficulty . . . from 11 to 20 percent of the workday or work week"—in his ability to maintain regular attendance, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal workday without interruptions from psychologically based symptoms. [R451]. She also found that Plaintiff was "limited but satisfactory"—defined as having a noticeable difficulty "no more than 10 percent of the workday or work week" in his ability to remember work-like procedures, understand and remember very short and simple instructions, maintain attention for two-hour segments, work in coordination with or in proximity to others without being unduly distracted, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and skilled work, interact appropriately with the general public, maintain socially appropriate behavior,

34

adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation. [R451-42]. Dr. Rao further opined that Plaintiff's mental impairments resulted in none-to-mild restrictions in his activities of daily living, ability to maintain social functioning and concentration, persistence, or pace, and that she did not expect any episodes of decompensation within the following twelve months. [R453]. Dr. Rao also opined that Plaintiff's psychiatric condition exacerbates his pain, that he would miss one day per month of work, and that his prognosis was poor, and she assigned a GAF score of 50.[29] [R449, 452, 454].

Plaintiff saw Dr. Rao for psychiatric follow up on August 20, 2013. [R583]. Plaintiff reported that he felt God was watching over him because a financial problem had resolved on its own. [R583]. A mental-status examination was unremarkable. [R583]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R584-85].

---

[29]    A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

AO 72A
(Rev.8/8
2)

On September 16, 2013, Dr. Patterson completed a lumbar-spine medical-source statement. [R461-64]. Dr. Patterson stated that Plaintiff had low-back pain radiating primarily to the left leg, that the pain averaged seven on a ten-point scale, and that the pain was worsened by prolonged sitting, standing, walking, or lifting greater than fifteen to twenty pounds. [R461]. He opined that because of his impairments, Plaintiff could only sit for twenty minutes and stand for thirty minutes at a time for about two hours each in an eight-hour workday; could occasionally climb stairs or lift less than ten pounds; could rarely twist, stoop, or bend; could never crouch, squat, or climb ladders; would need to shift his position at will; would need to take unscheduled breaks about four times a day for ten minutes each; would be off-task fifteen percent of the day; and would miss about two days of work each month. [R462-64].

Plaintiff saw Dr. Rao for psychiatric follow up on September 17, 2013. [R625-26]. He reported that he was tearful and depressed whenever he missed his wife but that he was seeing the light at the end of the tunnel with regard to his many difficulties and was especially excited that he might be able to adjust his mortgage payments. [R625]. A mental-status examination was normal except for notes indicating that Plaintiff's facial expression was sad, his motor behavior was agitated, and his content of thought was suspicious. [R625]. Dr. Rao assessed Plaintiff with a

36

GAF score of 60-51; specified that the score indicated "[m]oderate symptoms or difficulties (few friend[s], conflicts with peers); and continued medication. [R625-26].

Plaintiff presented to Atlanta Heart Associates on September 26, 2013, for review of diagnostic testing. [R465]. He also complained of chronic back pain and was noted to have stress and anxiety. [R465]. It was noted that Plaintiff was doing well, with no cardiac symptoms; that he was maintaining his usual level of activity; and that he reported doing reasonably well. [R465-66].

Reviewing physician Arthur Lesesne, M.D., completed a physical residual functional capacity assessment on October 7, 2013. [R88-90]. He found that Plaintiff could lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, could stand and/or walk six hours per eight-hour day, could sit six hours per eight-hour day with normal breaks, could climb ramps and stairs occasionally, and could balance, stoop, kneel, crouch, and crawl frequently, but could never climb ladders, ropes, and scaffolds and must avoid concentrated exposure to extreme heat, extreme humidity, unprotected heights, and dangerous moving machinery. [R103-04].

Plaintiff saw Dr. Rao for psychiatric follow up on October 15, 2013. [R581, 624-25, 855]. Plaintiff reported that his financial situation was dire and that he had come close to losing his house. [R581, 624, 855]. A mental-status examination

37

AO 72A
(Rev.8/8
2)

was normal. [R581, 624, 855]. Dr. Rao assessed Plaintiff with a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R581, 624-25, 855-56].

A cervical-spine MRI taken on October 26, 2013, indicated central canal stenosis at C5-6, along with spondylotic changes at C5-6 and C6-7, an osteophyte complex narrowing the left lateral recess at C6-7, and bilateral foraminal stenosis at C5-6 and C6-7. [R593-94]. It was also observed that at C5-6 there was narrowing of the central canal "8.4 mm AP at the level of the disc" and severe osseous stenosis of the bilateral intervertebral neuroforamina. [R593].

Dr. Rao completed another mental-impairment questionnaire on November 11, 2013. [R578-80]. She indicated that Plaintiff's mood was anxious with racing thoughts, that he had abnormal impulse control and a low tolerance for stress, and that his ability to make simple work-related decisions was abnormal due to increased panic attacks. [R578-80]. She also noted that while Plaintiff had been on medication for a long time, he still had ups and downs. [R578-80].

Plaintiff saw Dr. Rao for psychiatric follow up on November 12, 2013. [R854-55]. Plaintiff reported that he was "down" and not doing well because it was his wedding anniversary. [R854]. He also indicated that he did not have any capacity

38

to apply for a new job because his shoulder and neck pain had taken a toll on him. [R854]. A mental-status examination was unremarkable. [R854]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R854-55].

Plaintiff was evaluated by Shahram Rezaiamiri, M.D., a neurosurgeon, on November 26, 2013. [R597-98]. Plaintiff complained of left-arm pain that had persisted for two months, as well as numbness and tingling radiating down the back of his left arm into his fingers. [R597]. A review of systems indicated shortness of breath, joint stiffness, neck pain, feeling hot or cold, cough, back pain, and anxiety. [R598]. Plaintiff was observed to constantly hold and massage his left arm. [R598]. Lumbar-spine range of motion was normal; aside from 4/5 weakness in the triceps and biceps, strength was normal; there was no tenderness other than in the left paraspinal area; and Plaintiff's gait was normal. [R598]. Dr. Rezaiamiri assessed moderately severe radiculopathy involving the left arm with moderate weakness in the triceps and biceps. [R598]. He recommended a series of steroid injections and stated that if symptoms did not improve, a cervical discectomy and fusion at C5-7 would be

AO 72A
(Rev.8/8
2)

recommended. [R598]. He noted that he discussed the surgery with Plaintiff "but only as [a] last resort." [R598].

Plaintiff saw Dr. Rao for psychiatric follow up on December 10, 2013. [R622-23]. Plaintiff stated that the holidays had been extremely difficult because he missed his wife and that he was willing to wait until after the holidays for neck surgery because of ongoing treatment from the pain-management clinic. [R622]. A mental-status examination was unremarkable except for depressed mood and affect. [R622]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R622-23].

Reviewing physician William Gore, Ph. D., completed a psychiatric review technique and mental residual functional capacity assessment on December 17, 2013. [R100-01]. He found no restrictions in Plaintiff's activities of daily living but found that Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace. [R101]. Dr. Gore indicated that he gave controlling weight to Dr. Rao's opinion of June 20, 2013, given her treating relationship with Plaintiff. [R101]. Dr. Gore concluded that Plaintiff could remember simple one- or two-step instructions; attend to simple, repetitive tasks for two-hour

40

blocks of time; make simple work-related decisions; and respond to minor changes with minimal supervision; but should not work with the public or in the stress of close coordination with others, although he could do so within a non-stressful routine. [R106].

Reviewing physician Howard Colier, M.D., completed a physical residual functional capacity assessment on December 21, 2013. [R102-05]. He found that Plaintiff was able to lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, able to stand and/or walk six hours per eight-hour day, able to sit six hours per eight-hour day with normal breaks, able to stoop and climb ramps and stairs occasionally, and could balance, kneel, crouch, and crawl frequently, but could never climb ladders, ropes, and scaffolds and must avoid concentrated exposure to extreme heat, extreme humidity, unprotected heights, and dangerous moving machinery. [R103-04].

A review of systems during a visit to Atlanta Heart Associates taking place on December 26, 2013, indicated anxiety and stress. [R614].

Plaintiff saw Dr. Rao for psychiatric follow up on January 7, 2014. [R621-22, 852-53]. Plaintiff reported that he had been in a car accident and that while he was not hurt, his car was not driveable, and he had no other car to drive.

41

[R621, 852].   He also reported that he had been denied disability benefits. [R621, 852].  Dr. Rao observed that Plaintiff was made extremely anxious by ongoing crises, "yet free of any delusions or hallucinations or suicidal tendencies." [R621, 852].  A mental-status examination was normal.  [R621, 852].  Dr. Rao assessed Plaintiff with a GAF score of 60-51; specified that the score indicated "[m]oderate symptoms or difficulties (few friend[s], conflicts with peers); and continued medication.  [R621-22, 852-53].

Plaintiff presented to Dr. Rezaiamiri on January 8, 2014, for a six-week follow up after two epidural steroid injections into the cervical spine.  [R596].  Plaintiff reported very good relief from the injections:  he denied any numbness or tingling and stated that the pain was only at two or three on a ten-point pain scale, he was very pleased with the outcome of the injections, and he wished to continue with conservative therapy.  [R596].

Plaintiff returned to Dr. Patterson on January 20, 2014.  [R658].  It was noted that Plaintiff had cervical and lower-back pain that radiated into his left shoulder and left leg down to the knee and was at eight on a ten-point scale; that he was unable to stand for long periods, sit for long periods, sleep, or bend; and that conservative treatment (physical therapy, chiropractic treatment, NSAIDS, oral medications, and

42

home exercises) had failed. [R658]. Dr. Patterson assessed lumbago and lumbar spondylosis without myelopathy and administered lumber facet joint injections. [R658].

Plaintiff returned to Dr. Patterson to undergo radiofrequency ablation for treatment of lumbago on February 10, 2014. [R697-98]. It was noted that Plaintiff had chronic pain; that he had been treated with nonsteriodal anti-inflammatories and physical therapy and had failed conservative treatment; and that he had received facet injections in order to decrease pain, enable him to better tolerate physical therapy, and determine that he was a candidate for radiofrequency ablation. [R697]. It was noted that his pain level was at eight before the procedure and was at zero after the procedure. [R698].

Plaintiff saw Dr. Rao for psychiatric follow up on March 4, 2014. [R619, 850-51]. Plaintiff was observed to be excited about his daughter's upcoming wedding and relieved about money he received from filing his late wife's tax return. [R619, 850]. A mental-status examination was unremarkable. [R619, 850]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R619-20, 851].

43

On March 25, 2014, upon Dr. Patterson's referral, Plaintiff presented to Cindy Demestihas, M.D., at Piedmont Hospital's emergency room with complaints of a headache that had been constant for two days. [R604-07]. Plaintiff rated the pain at seven on a ten-point scale. [R604]. Upon examination, it was noted that Plaintiff had 4/5 motor strength in his left arm from chronic neck pain. [R605]. Dr. Demestihas opined that the headache was probably related to radiculopathy. [R607].

A review of systems during a visit to Atlanta Heart Associates taking place on March 27, 2014, indicated anxiety and stress. [R611]. It was also noted that Plaintiff complained of low-back pain and had been recently treated for occipital neuralgia[30] with local shots. [R611]. Plaintiff was observed to be doing well, with no cardiac symptoms. [R611]. It was also noted that he remained stable and was maintaining his usual level of activity. [R612].

---

[30] Occipital neuralgia is a distinct type of headache characterized by piercing throbbing, or electric-shock-like chronic pain in the upper back, back of the head, and behind the ears, usually on one side of the head. The location of the pain is related to the areas supplied by the occipital nerves, which run from the area where the spinal column meets the neck, up to the scalp at the back of the head. The pain is caused by irritation or injury to the nerves. Nat'l Inst. of Neurological Disorders & Stroke, Occipital Neuralgia Information Page, https://www.ninds.nih.gov/Disorders/All-Disorders/Occipital-Neuralgia-Information-Page (last visited 3/26/18).

AO 72A
(Rev.8/8
2)

Plaintiff saw Dr. Rao for psychiatric follow up on April 1, 2014. [R618, 849-50]. Plaintiff stated that he had too many scares about his health and described waking up with neck pain so intense that he had to call an ambulance and receive injections. [R618, 849]. A mental-status examination was unremarkable. [R618, 849]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R618-19, 850].

At a visit to Dr. Patterson's office taking place on April 2, 2014, it was noted that Plaintiff had one-hundred-percent relief from an occipital block, had better sleep, and was more active. [R725]. Plaintiff also reported cervical pain into his left shoulder with tingling in his arm, but he rated the pain at two on a ten-point scale and reported that although he had filled the Percocet prescription he received at the emergency room, he had not taken any. [R725].

Plaintiff visited Dr. Patterson on May 23, 2014, with complaints of cervical pain. [R789]. It was noted in Plaintiff's medical history that he was unable to stand or sit for long periods, bend, or sleep, and that his pain averaged six on a ten-point scale, but notes also indicate that he reported continued sixty-percent improvement with cervical epidural steroid injections administered on May 7, 2014. [R789, 793]. Upon

45

examination, it was noted that Plaintiff had cervical pain with flexion, extension, and rotation bilaterally; positive Spurling's[31]; lumbar/thoracic difficulty with side axial loading; and pain with minimal lumbar extension; but that he also had a normal gait. [R789]. Dr. Patterson diagnosed cervical radiculopathy and lumbar spondylosis without myelopathy; increased Plaintiff's Neurontin; and prescribed Norco and hydrocodone. [R790].

Plaintiff returned to Dr. Patterson on June 20, 2014. [R787-88]. He described left cervical pain radiating into his left shoulder and down the left upper extremity that averaged ten out of ten on the pain scale and had become "unbearable." [R787]. Plaintiff also reported associated weakness, poor sleep, anxiety, and fatigue. [R787]. Dr. Patterson noted again that Plaintiff had failed conservative treatment. [R787]. He recommended that Plaintiff follow up with Dr. Rezaiamiri and noted that his medications needed to be adjusted due to "severity of pain." [R787-88]. Dr. Patterson diagnosed cervical radiculopathy, refilled Plaintiff's Neurontin, stopped Norco, and prescribed a combination acetaminophen-oxycodone tablet. [R788].

_____

[31] The Spurling's maneuver is a technique used for evaluating cervical nerve root impingement. The test is considered positive when the maneuver elicits "typical radicular arm pain." MediLexicon, Spurling Test, http://www.medilexicon.com/dictionary/90833 (last visited 3/26/18).

46

Plaintiff returned to Atlanta Heart Associates on June 26, 2014, for follow up of atherosclerosis and hyperlipidemia. [R805]. It was noted that he had anxiety and stress, complained of neck pain, and was going to see a surgeon the following day. [R805]. It was also noted that Plaintiff was maintaining his usual level of activity and stated that he was doing reasonably well. [R806].

Plaintiff visited Dr. Rezaiamiri on June 27, 2014, with complaints of pain in his left shoulder, left neck, and left arm that was not relieved by two Percocet tablets. [R778]. It was noted that Plaintiff had undergone three cervical epidural steroid injections by Dr. Patterson, all with short benefits, and that he knew that he needed surgery and that other measures would not be successful, but that he wanted to wait until later in the year to have surgery. [R778]. Dr. Rezaiamiri also stated that it would be decided about three weeks prior to surgery whether to perform surgery at one or two levels. [R778].

Plaintiff returned to Dr. Patterson on July 18, 2014, for follow-up on cervical pain. [R785-86]. He reported that the pain was at nine on a ten-point scale, and it was noted that Plaintiff was unable to stand for long periods, sleep, or bend. [R785]. Dr. Patterson diagnosed cervical radiculopathy and cervical disc displacement and refilled Plaintiff's prescription for acetaminophen-oxycodone. [R786].

47

Plaintiff returned to Dr. Patterson on August 15, 2014, for low-back pain and neck pain. [R782]. It was noted in Plaintiff's medical history that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework, but that Plaintiff was unable to stand or sit for long periods, bend, or sleep. [R782]. He rated his pain at seven on a ten-point scale, and it was noted that his Neurontin and Lortab helped his pain. [R782]. Upon a review of systems, it was noted that Plaintiff's lumbar was remarkable for muscle stiffness and that he had tingling numbness, trouble sleeping, serious depression, high stress level, and sleep disturbances. [R782]. General examination was unremarkable. [R783]. Dr. Patterson diagnosed cervical radiculopathy and refilled Plaintiff's Neurontin and acetaminophen-oxycodone tablets. [R783].

Plaintiff saw Dr. Rao for psychiatric follow up on September 17, 2014. [R844]. Plaintiff expressed disappointment that he had to continue to wait for social security benefits. [R844]. A mental-status examination was unremarkable. [R844]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R845].

48

Plaintiff returned to Atlanta Heart Associates on September 18, 2014, for follow-up of atherosclerosis and hyperlipidemia. [R802]. It was noted that he complained of low-back pain and had anxiety and stress. [R802]. It was also noted that Plaintiff was maintaining his usual level of activity and stated that he was doing reasonably well. [R803-04].

Plaintiff saw Dr. Rao for psychiatric follow up on October 15, 2014. [R843-44]. Dr. Rao noted that Plaintiff was still having financial problems and had a hectic four weeks because he had to care for his mother after her second knee surgery. [R843]. A mental-status examination was unremarkable. [R843-44]. Dr. Rao assessed a GAF score of 70-61; specified that the score indicated "[m]ild symptoms or difficulties, but generally functioning pretty well, conflicts"; and continued medication. [R844].

Plaintiff presented to Atlanta Heart Associates on December 15, 2014, for cardiac clearance to proceed with anticipated surgery. [R798]. He complained primarily of left-arm pain, and it was noted that he had been diagnosed with cervical-spine disc disease. [R798]. He also complained of low-back pain and was noted to have stress and anxiety. [R799]. It was noted that Plaintiff had no cardiac symptoms; was maintaining his usual level of activity; and reported doing reasonably well. [R800]. It was determined that his cardiac status was stable for surgery. [R800].

49

On December 23, 2014, Dr. Rezaiamiri performed a cervical discectomy and fusion at C5-6-7. [R818-19].

Plaintiff presented to Atlanta Heart Associates on March 19, 2015, for follow up of atherosclerosis and hyperlipidemia. [R795]. He also complained of chronic back pain and was noted to have stress and anxiety. [R795]. It was noted that Plaintiff had no cardiac symptoms, was maintaining his usual level of activity, and reported doing reasonably well. [R796].

Plaintiff returned to Dr. Patterson on July 10, 2015, with complaints of neck and lower-back pain that he rated at seven on a ten-point scale. [R824]. It was noted that Plaintiff's baseline activities included walking, standing, cooking, light housework, and heavy housework but that he was unable to stand or sit for long periods, bend, or sleep. [R824]. Upon examination, it was noted that Plaintiff had lumbar facet pain, worse with facet loading maneuver, but his gait was normal. [R828]. Dr. Patterson diagnosed cervicalgia[32] and lumbar spondylosis without myelopathy and refilled Neurontin, acetaminophen-oxycodone, and cyclobenzaprine hydrochloride.[33] [R828].

_____

[32]    "Cervicalgia" refers generally to neck pain. *See* J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* A-227, C-171 (46th ed. 2012).

[33]    Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains,

AO 72A
(Rev.8/8
2)

*E.    Vocational-Expert Testimony*

A vocational expert ("VE") also testified before the ALJ. [R71-79]. The VE was asked about the working capabilities of a person of Plaintiff's age, education, and work experience, who is able to lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, able to stand and/or walk six hours per eight-hour day, able to sit six hours per eight-hour day with normal breaks, able to climb ramps, and stairs occasionally, and can stoop, kneel, crouch, crawl frequently, but can never climb ladders, ropes, or scaffolds and must avoid concentrated exposure to extreme heat, extreme humidity, unprotected heights, and dangerous moving machinery. [R75-76]. The VE opined that the person would be able to perform Plaintiff's past work as a custodian (heavy work, as typically performed; medium work, as performed by Plaintiff), letter carrier (light), or postal clerk (light), [R72-73], and that such a person with Plaintiff's transferable skills would be able to perform work as an appointment clerk (sedentary), order clerk (sedentary), or information clerk (sedentary), [R73-74, 76]. The VE further testified that the person could still perform the past work and the identified work if the person were able to concentrate for two hours at a time

_____

sprains, and other muscle injuries. MedlinePlus, Cyclobenzaprine, https://medlineplus.gov/druginfo/meds/a682514.html (last visited 3/26/18).

AO 72A
(Rev.8/8
2)

in an eight-hour workday with normal breaks and if the person were off-task ten

percent of the time, but that the person could not meet the production requirements of

work if he required a rest period of ten minutes per hour or if he were off-task twenty

percent of the workday.  [R76-78].

## V.    ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social
Security Act through December 31, 2017.

2.    The claimant engaged in substantial gainful activity during the
following periods: January 1, 2010, the alleged onset date, through
January 31, 2013.  (20 CFR 404.1520(b) and 404.1571 *et seq.*).

. . .

3.    However, there has been a continuous 12-month period(s) during
which the claimant did not engage in substantial gainful activity.
The remaining findings address the period(s) the claimant did not
engage in substantial gainful activity.

. . .

4.    The claimant has the following severe impairment: degenerative
disc disease.  (20 CFR 404.1520(c)).

. . .

5.    The claimant does not have an impairment or combination of
impairments that meets or medically equals the severity of one of

52

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

6.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that he can lift fifty pounds occasionally and twenty-five pounds frequently. The claimant can stand, walk, or sit six hours in an eight-hour workday each. The claimant can occasionally climb ramps or stairs; but can never climb ladders, ropes, or scaffolds. The claimant can frequently stoop, kneel, crouch, or crawl. He must avoid concentrated exposure to extreme heat, extreme humidity, unprotected heights, and dangerous moving machinery. Due the claimant's condition, he would be off task for up to 10% of the workday.

. . .

7.     The claimant is capable of performing past relevant work as a Letter Carrier and as a Custodian. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565).

. . .

8.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2010, through the date of this decision. (20 CFR 404.1520(f)).

[R26-34].

AO 72A
(Rev.8/8
2)

In explaining the weight she assigned to the various mental-health opinions, the ALJ stated that she gave "great weight" to Dr. Rao's treating opinion of June 20, 2013, because she found it consistent with Dr. Rao's findings throughout the record, "which generally show[ed] largely normal mental status examinations and minimal mental health symptoms"; she gave "little weight" to Dr. Rao's opinion of August 2, 2013, that Plaintiff was seriously limited in maintaining regular attendance, sustaining a routine, making simple decisions, was unable to meet the competitive standards of performing at a consistent pace, and would be absent from work one day per month because of the issues, because the limitations were inconsistent with Dr. Rao's concurrent opinion that Plaintiff had only mild restriction in her activities of daily living, social functioning, and concentration, and the limitations were substantially more restrictive than the opinions stated in Dr. Rao's June opinion; she assigned "marginal weight" to Dr. Rao's opinion of November 11, 2013, that Plaintiff had a low tolerance for stress, had issues making simple decisions, and was somewhat likely to decompensate, because the opinion drew significantly greater limitations from findings similar to those appearing in the June opinion, did not specify how Plaintiff's ability to make decisions would be limited, and was inconsistent with the treatment notes cited in the opinion; she assigned "some weight" to the GAF ratings because they were

54

"mere snapshots" of Plaintiff's functioning at the time and because the longitudinal

mental-health record largely consisted of mental-status results within normal limits;

she gave "great weight" to Dr. Massey's reviewing opinion of August 2, 2013, that

Plaintiff had no restrictions in activities of daily living, no restrictions in social

functioning, mild restrictions to concentration, persistence, or pace, and no episodes

of decompensation because it was consistent with the objective record reflecting no

substantial psychological issues; and she assigned "little weight" to Dr. Gore's

reviewing opinion of December 17, 2013, that Plaintiff had moderate restrictions in the

areas of social functioning and concentration and could follow rules, remember simple

one-to-two-step instructions, make simple work-related decisions, and respond to

minor changes in work routine but should not work with the public or with the stress

of close coordination with others because the opinion was not consistent with the

record. [R31-32]. In explaining the weight she assigned to the various opinions

regarding Plaintiff's physical limitations, the ALJ stated that she gave "little weight"

to Dr. Patterson's treating opinion of September 16, 2013, that Plaintiff could sit,

stand, or walk two hours in an eight-hour day, would need to shift positions at will,

could occasionally lift less than ten pounds and could rarely lift or carry ten pounds,

could never perform a number of postural activities, would be off task fifteen percent

AO 72A
(Rev.8/8
2)

of the workday, and would be absent two times per month because the opinion was "not consistent with the overall record, including imaging reports revealing no significant central spinal stenosis"; she assigned "great weight" to Dr. Lesesne's reviewing opinion of October 7, 2013, that Plaintiff could perform medium work, never climb ladders, ropes, or scaffolds, could occasionally climb ramps or stairs, could frequently perform other postural activities, and must avoid concentrated exposure to extreme heat, humidity, and hazards, because the opinion was consistent with the record; and she assigned "great weight" to Dr. Colier's reviewing opinion of December 21, 2013, containing similar limitations plus the limitation to occasionally stooping, because the opinion was consistent with the record. [R31-32].

## VI.   CLAIMS OF ERROR

Plaintiff argues that the ALJ made numerous reversible errors in her consideration of the opinion evidence. [Doc. 10 at 10-23]. As to the opinions of physical limitation, Plaintiff first contends that the ALJ impermissibly cherry-picked the record when she found, based on her perception that imaging reports revealed no significant central spinal stenosis, that Dr. Patterson's notes were not consistent with the overall record, [R32]. [Doc. 10 at 11]. He points out that the same MRI revealed other significant abnormalities, [R368-69]; that contrary to the ALJ's assertion, the

56

October 2013 MRI did show central canal stenosis, [R593-94]; and that the ALJ cited

no evidence to support her apparent belief that central canal stenosis is more important

than the other abnormalities revealed by the MRIs. [Doc. 10 at 11-12]. He also

contends that Dr. Patterson's opinions are "well supported" by his treatment notes

indicating that Plaintiff had tried various conservative treatments; was unable to stand

or sit for long periods, or sleep, or bend; and received only temporary relief from the

many epidural steroid injections, therapeutic facet blocks, and radiofrequency ablation

procedures he underwent from 2012 through 2014, [R373, 379, 381-82, 396, 400, 407,

409, 634, 636, 640, 644, 648, 650, 656, 658, 697-98, 785-89], and are consistent with

the treatment notes from Piedmont Hospital, [R604-05], and Dr. Rezaiamiri, who

ultimately performed a cervical discectomy and fusion at C5-6-7 in December 2014,

[R597-98, 778, 787-88, 818-19]. [Doc. 10 at 12-14]. Second, Plaintiff contends that

the ALJ erred by failing to explain why she found he would be off-task only ten

percent of the time, [R30], particularly since Dr. Patterson opined that Plaintiff would

be off-task fifteen percent of the day, [R464], and the VE testified that being off-task

for sixteen percent of the day would preclude work activities but being off-task for ten

percent of the day would not, [R77-79]. [Doc. 10 at 14-15]. Third, Plaintiff argues

that the ALJ's explanation that the reviewing opinions are consistent with the record

AO 72A
(Rev.8/8
2)

and Plaintiff's admissions regarding his activities of daily living, [R31], does not supply substantial evidence for assigning "great weight" to the reviewing opinions because the reviewing opinions are not consistent with the treatments notes and conclusions of Dr. Patterson and Dr. Rezaiamiri, and Plaintiff's daily activities are extremely limited. [Doc. 10 at 15]. Fourth, Plaintiff argues that because the most recent reviewer, [R94-99], did not have the opportunity to review any of the 2014 treatment notes indicating continued pain and non-conservative treatment, [R598, 631, 634, 636, 640, 644, 648, 652, 658, 778, 787, 789, 793], the reviewing opinions were stale. [Doc. 10 at 15-16]. Fifth, Plaintiff contends that the ALJ erred by failing to resolve the conflict between the reviewing opinions as to Plaintiff's ability to stoop and adopting the older, less-restrictive opinion into the RFC, [R29, 31, 89, 103], despite Dr. Patterson's opinion that Plaintiff could rarely stoop, [R463], Plaintiff's testimony that he avoided bending "at all costs," [R64], and an Agency ruling recognizing that medium work usually requires frequent bending and stooping, Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *6. [Doc. 10 at 16-17].

As to the opinions of mental limitations, Plaintiff argues first that it was error for the ALJ to discount Dr. Rao's later opinions as inconsistent with June 2013 notes without considering the diagnosis of bipolar disorder, which inherently signals mood

58

variability. [Doc. 10 at 18-19 (comparing [R31-32] with [R337-40, 449-54, 578-80])].

He also suggests that the ALJ's note discounting Dr. Rao's November 2013 opinion

because it is not "entirely specific" about how Plaintiff's ability to make decisions

would be limited, [R32, 578-80], was improper because degree of specificity of a

treating source's findings is not a factor supporting giving the findings little weight,

20 C.F.R. § 404.1527(c)(2)-(6), and the lack of specificity did not stop the ALJ from

giving great weight to similar findings made by Dr. Rao in June 2013, [R31, 337-39].

[Doc. 10 at 20]. Second, Plaintiff argues that when the ALJ failed to include any

mental limitations in the RFC, [R29], she disregarded well-supported limitations

suggested by the June 2013 opinion to which she did assign great weight, [R337-40].

[Doc. 10 at 20-21]. Third, Plaintiff argues that the ALJ erred by giving greater weight

to the reviewing opinion of Dr. Massey, [R31, 82-87], over the reviewing opinion of

Dr. Gore, [R31, 101, 105-07], because Dr. Gore reviewed the record later, when it had

been more thoroughly developed, and the ALJ failed to acknowledge that Dr. Gore's

opinion is consistent with Dr. Rao's August 2013 findings. [Doc. 10 at 21-22].

Additionally, Plaintiff argues that if he were limited to simple, sedentary work,

he would be unable to perform his past work or any of the other work identified by the

VE and would be disabled by application of the Medical-Vocational Guidelines, based

on his age and education.  [Doc. 10 at 17, 22-23 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.14))].

In response, the Commissioner argues that the ALJ provided good reasons, supported by substantial evidence, for discounting Plaintiff's treating physicians' opinions in favor of the state agency reviewing opinions.  [Doc. 11 at 8-24].  In response to Plaintiff's first argument, she contends that the ALJ properly considered and discounted Dr. Patterson's opinion, [R461-64], as the ALJ acknowledged Dr. Patterson's treating history and imaging showing degenerative changes, but nevertheless assigned Dr. Patterson's opinion little weight based on the imaging showing no significant central spinal stenosis and on her finding that the overall record did not support Dr. Patterson's limitations, [R30, 32, 368-69, 373, 377-80, 384-87, 391-92, 403, 405, 409, 411, 413, 768].  [Doc. 11 at 9-11].  The Commissioner also argues that the complaints of cervical pain and the cervical imaging performed after Dr. Patterson rendered his opinion does not support Dr. Patterson's opinion that Plaintiff's lumbar spine condition was disabling, and she suggests that 2014 notes show that Plaintiff received sufficient relief from cervical injections, [R596, 631, 725].  [Doc. 11 at 9, 12].  The Commissioner also points out that Dr. Patterson noted Plaintiff's subjective symptoms and argues that a claimant's subjective symptoms are

60

not an acceptable basis for an opinion. [Doc. 11 at 11 (citing 20 C.F.R. § 404.1527(c); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lacina v. Comm'r, Soc. Sec. Admin.*, 606 Fed. Appx. 520, 528 (11th Cir. Apr. 1, 2015))]. The Commissioner also contends that Dr. Patterson's opinion is undermined by the conservative treatment rendered before the opinion, [R30, 741]; the fact that Plaintiff worked through much of the period during which Dr. Patterson treated Plaintiff prior to rendering the opinion, [R47, 210, 214]; and Dr. Patterson's treatment notes indicating that Plaintiff's baseline activities included walking, standing, cooking, and light and heavy housework and that although Plaintiff had recently retired, he was starting back at work in April 2013, [R373, 396, 400, 402, 404, 497-09, 411, 413]. [Doc. 11 at 11-12]. Additionally, the Commissioner argues that Dr. Patterson's opinion is inconsistent with record treatment notes of other providers showing normal gait, range of motion, and back examination, [R30, 466, 598]. [Doc. 11 at 12]. The Commissioner also contends that the ALJ did not impermissibly cherry-pick evidence, as she stated that she considered the entire record, and it is not necessary for an ALJ to discuss each piece of evidence so long as it can be determined that the claimant's entire medical condition has been considered pursuant to the proper regulatory and statutory requirements. [Doc. 11 at 13]. With regard to Plaintiff's second

61

argument—that the ALJ failed to explain her findings regarding the percentage of time Plaintiff would be off task—the Commissioner contends that the ALJ properly discounted Dr. Patterson's opinion that Plaintiff would be off task fifteen percent of the workday and that the RFC determination is reserved to the ALJ. [Doc. 11 at 13-14]. As to Plaintiff's arguments regarding the ALJ's weighting of the reviewing opinions, the Commissioner argues that the ALJ properly assigned those opinions greater weight than Dr. Patterson's opinion because they were consistent with the record and Plaintiff's admitted daily activities, including maintaining his personal care, putting on shoes, preparing complete meals, performing household chores in thirty-minute increments without assistance, driving, shopping in stores for food or clothing, and attending church, [R62, 232-35, 251-54]; they were rendered without any less information regarding future neck and shoulder complaints and future surgery than Dr. Patterson had, [R88-90, 102-05, 774-77]; and the ALJ stated that she considered the entire record. [Doc. 11 at 14-16]. She also suggests that there is no legal authority that precludes an ALJ from giving considerable weight to a physician's opinion if the physician did not review all of the evidence. [Doc. 11 at 16]. With regard to the reviewers' conflicting opinions regarding Plaintiff's ability to stoop, the Commissioner argues that the ALJ did not err, as she discussed Plaintiff's treatment record and noted

62

that there was some support for postural restrictions, [R30], and she was not specifically required to discuss in greater detail Dr. Colier's opinion that Plaintiff would be able to only occasionally stoop, [R103]. [Doc. 11 at 16-17].

With regard to Plaintiff's argument concerning the ALJ's evaluation of her mental impairments, the Commissioner points out that the ALJ expressly considered that Dr. Rao's GAF assessments ranged from 50 to 70 and that GAF scores of 50 indicate serious issues, [R32], and argues that in considering the range of GAF scores along with the other evidence, she fulfilled her obligation to consider the evidence as a whole. [Doc. 11 at 19-20]. The Commissioner further asserts that the failure to address the diagnosis of bipolar disorder was not error because diagnoses do not establish work-related limitations, [*id.* at 21], and that the ALJ did not err in discounting Dr. Rao's November 2013 opinion that Plaintiff had a low tolerance for stress and an abnormal ability to deal with changes in the work setting due to panic attacks, [R578-80], because the opinion was conclusory and conflicted with treatment notes from her most recent visit, [R32, 581]. [Doc. 11 at 22-23]. Finally, with regard to the weight assigned the reviewing opinions, the Commissioner argues that the ALJ did not err in her consideration of Dr. Gore's opinion, [R106], as Dr. Rao's August 2013 opinion actually stated that Plaintiff had limited but satisfactory skills in

63

interacting with others and had only mild restrictions in social functioning, [R457], and Dr. Rao's notes around that time show mild symptoms, friendly and cooperative behavior, and no discussion regarding stress of social interaction, [R420-21], and that she did not err by assigning great weight to Dr. Massey's opinion because the ALJ had the benefit of reviewing other later opinions and evidence and found them consistent with Dr. Massey's opinion. [Doc. 11 at 23-24].

After careful consideration of the ALJ's decision, the parties' arguments, and the evidence of record, the Court concludes that the decision of the Commissioner is due to be reversed and remanded for further consideration. As an initial matter, the Court finds that the opinions of the state agency reviewing physicians, Dr. Lesesne and Dr. Colier, [R102-05], to which the ALJ assigned "great weight" and credited over the opinion of treating pain specialist Dr. Patterson, [R31-32], are, as a matter of law, insufficient to serve as substantial evidence to support the decision of the Commissioner. "The Social Security Act 'contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing.' " *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (quoting *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)). The hearing must be "both full and fair." *Miles, id.* Among the Commissioner's responsibilities in ensuring that the hearing was full and

64

fair is an obligation to respond to a request for review of an administrative decision with an answer that includes a certified copy of the transcript of the record "including the evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g).

Here, the Court's review of the opinions of Dr. Lesesne and Dr. Colier reveals that they rely on a consultative examination by Alexander N. Dorman and an associated x-ray that are inconsistent with other evidence appearing in the record and are not themselves contained in the record. (*See* [R90, 104] (Dr. Lesesne's and Dr. Colier's assignment of "some weight" to the opinion of consultative examiner Dr. Dorman and reference to an associated lumbar-spine x-ray)). According to the reviewing opinions, Dr. Dorman performed a consultative examination on August 30, 2013, during which Plaintiff had an x-ray of the lumbar spine that showed mild disc space narrowing at L3-L4 and L5-S1 and purportedly stated that he was not going to a pain clinic or anticipating any surgical procedure. [R90, 104]. This conflicts with record evidence indicating that Plaintiff underwent an MRI on March 8, 2012, that showed moderate-to-severe disc space narrowing at L3-L4, severe facet hypertrophy bilaterally at L4-5, mild-to-moderate foraminal stenosis bilaterally at L4-5 and L5-S1, and small left foraminal to extra-foraminal disc bulging at L2-3

65

AO 72A
(Rev.8/8
2)

abutting the left L2 nerve root, [R368-69]; that Plaintiff had been seeing Dr. Patterson consistently since at least April 2012, [R373-74, 377-79, 381-82, 384-87, 391-92, 404-05, 407-11, 413, 768, 770, 772]; and that by August 30, 2013, Plaintiff had already received multiple lumbar epidural injections, [R772 (injections on May 4, 2012); R386 (July 9, 2012, notes on Plaintiff's condition after his third round of injections); R381 (injections on August 15, 2012)]. The Court has been unable to locate Dr. Dorman's opinion or the associated x-ray in the record, and despite the Court's having provided the Commissioner with notice and an opportunity to respond, [*see* Docs. 14, 15], the Commissioner has also been unable to point to a record containing Dr. Dorman's opinion or the associated x-ray.

It is true that Plaintiff failed to raise the issue of the missing consultative-examiner opinion and therefore arguably waived it. *See Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856 n.1 (11th Cir. Feb. 8, 2013) (holding that challenges not explicitly asserted were effectively abandoned); *Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (holding that a claim was waived where its proponent did not supply an argument or provide a citation to authority about the claim); *Jones v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 767, 770 (11th Cir. May 12, 2006) (holding that only the arguments asserted before the district

AO 72A
(Rev.8/8
2)

court were preserved for appeal) (citing *Jones*, 190 F.3d at 1228). Be that as it may, the Court did provide the Commissioner with notice and an opportunity to be heard on the issue. [*See* Docs. 14, 15]. Moreover, the notion that an appellate court will not consider an issue that has not been properly raised is a "is not a jurisdictional limitation but merely a rule of practice," and the Eleventh Circuit Court of Appeals has permitted issues to be raised for the first time on appeal under certain circumstances, among them, where the issue "involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice"; where "the interest of substantial justice is at stake"; or "where the proper resolution is beyond any doubt." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (punctuation omitted). In this case, where the ALJ's decision relies heavily on opinions of reviewing physicians over a contrary opinion of a treating physician, [R31, 32]; the opinions of the reviewing physicians in turn rely heavily on a consultative examination and x-ray evidence, [R90, 104], that conflict with other imaging, [R368-69], treatments notes, [R373-74, 377-79, 381-82, 384-87, 391-92, 404-05, 407-11, 413, 768, 770, 772], and the opinion of the treating physician, [R461-64]; and the unfavorable consultative examination and x-ray are nowhere to be found, it can hardly be said that the claimant's right to a full and fair hearing has not been violated. This is particularly true here, where Plaintiff

67

is an individual closely approaching advanced age and therefore may be disabled by application of the Medical-Vocational Guidelines under a marginally more restrictive RFC. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.14. Thus, the Court finds that the case is subject to remand in the interest of substantial justice.

Additionally, even if it were not so clear that Plaintiff's right to a full and fair review of the administrative decision was not violated by the omission of the opinion of consultative examiner Dr. Dornan and the x-ray accompanying the opinion, the Court agrees with Plaintiff that there are numerous other errors supplying grounds for reversal. Plaintiff's arguments regarding the medical record and opinion evidence of his physical impairments are particularly well taken. Where an ALJ gives the opinion of a treating physician less than controlling weight, she must clearly articulate reasons establishing good cause for doing so. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 63 (11th Cir. Feb. 16, 2010) (citing *Lewis*, 125 F.3d at 1440)); *see also* SSR 96-2p. Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*,

AO 72A
(Rev.8/8
2)

357 F.3d 1232, 1241 (11th Cir. 2004).  As Plaintiff points out, the ALJ did not supply good cause for assigning "little weight" to Dr. Patterson's treating opinion.

The ALJ stated that she accorded Dr. Patterson's opinion "little weight" because it was "not consistent with the overall record, including imaging reports revealing no significant central spinal stenosis."  [R32].  Review of the referenced MRI shows, however, that while it revealed "no significant central spinal stenosis," it did indicate degenerative changes, including disc desiccation and spondylosis at every level; moderate-to-severe disc space narrowing at L3-L4; severe facet hypertrophy bilaterally at L4-5; mild-to-moderate foraminal stenosis bilaterally at L4-5 and L5-S1; and small left foraminal to extra-foraminal disc bulging at L2-3 abutting the left L2 nerve root. [R368-69].  Tellingly, while the ALJ generally noted that the MRI revealed degenerative changes, she did not acknowledge the numerous indications that abnormalities were severe.  [R30].  And while it is true that Plaintiff did work for several months after the MRI was taken, it also bears remark that Dr. Patterson's notes around that time indicate that working was one of the factors that aggravated Plaintiff's pain, [see, e.g., R373, 409, 411, 413], and that Dr. Rao's notes indicate that she recommended that he consider early retirement because of his declining health, [R354]. Likewise, while Dr. Patterson did note that Plaintiff planned to return to work in

69

April 2013, [R407-08], the Court finds no indication in the earnings records or anywhere else that Plaintiff was actually able to do so, [*see, e.g.*, R189-90, 195]. In order to determine that the ALJ's decision was supported by substantial evidence, it must be clear the that ALJ took into account evidence both favorable and unfavorable to his opinion. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence). Here, the ALJ impermissibly cherry-picked evidence favorable to his opinion while ignoring significant evidence favorable to Plaintiff's claim.

The ALJ's discussion of the treatment record is also far from straightforward, as she acknowledges that conservative treatments were unsuccessful and that Plaintiff ultimately underwent cervical surgery in December 2014, but then bases her conclusion that Plaintiff was capable of medium work on the grounds that in late 2013 and early 2014 he "pursued conservative treatment options that provided a substantial amount of relief." [R30]. Obviously, conservative treatment was not successful. [*See* R598 (recommendation that Plaintiff undergo a series of steroid injections); 611 (notes regarding Plaintiff's receipt of injections for occipital nerve pain); 658 (lumbar facet joint injections); 697-98 (radiofrequency nerve ablation); 778 (notes of multiple

cervical epidural steroid injections, all with short benefits); 818-19 (cervical discectomy and fusion)]. A decision cannot be said to be supported by substantial evidence when it relies on statements that are patently untrue. *Flentroy-Tennant v. Astrue*, No. 3:07-cv-101-J-TEM, 2008 WL 876961, at *6, 8 (M.D. Fla. Mar. 27, 2008) (An "ALJ is required to build an accurate and logical bridge from the evidence to his or her conclusion."); *Baker v. Barnhart*, No. 03 C 2291, 2004 WL 2032316, at *8 (N.D. Ill. Sept. 9, 2004) (same).

The Court additionally agrees with Plaintiff that even were the ALJ's reasoning sufficient to support crediting the reviewing physicians opinions over Dr. Patterson's opinion as of the date they were rendered (a finding the undersigned does not reach), the opinions could not serve as substantial evidence to support the RFC because they did not take into account significant evidence supportive of Plaintiff's claims. As Plaintiff points out, Dr. Lesesne's opinion was issued in October 2013, and Dr. Colier's opinion was issued in December 2013, and does not note reviewing any records post-dating the consultative opinion purportedly rendered by Dr. Dorman in August 2013. [R88-90, 102-05]. As a consequence, the reviewers arrived at their determinations that Plaintiff could perform a restricted range of medium work *without* review of records showing that the cervical-spine MRI taken on October 26, 2013,

71

indicated central canal stenosis at C5-6, along with spondylotic changes at C5-6 and C6-7, an osteophyte complex narrowing the left lateral recess at C6-7, and bilateral foraminal stenosis at C5-6 and C6-7, and showed that at C5-6 there was narrowing of the central canal "8.4 mm AP at the level of the disc" and severe osseous stenosis of the bilateral intervertebral neuroforamina, [R593-94]; that in November 2013, Dr. Rezaiamiri diagnosed moderately severe radiculopathy involving the left arm with moderate weakness in the triceps and biceps and was already contemplating that surgery might be necessary, [R597-98]; that Plaintiff underwent multiple spinal injections and nerve ablation, [R596, 658, 697-98, 611]; that in March 2014, the radiculopathy became so severe that it required hospitalization, [R604-07]; or that in December 2014, Plaintiff underwent a cervical discectomy and fusion at C5-6-7, [R818-19]. The Commissioner makes no attempt to show that a medical source rendered a physical RFC in light of this evidence. [*See* Doc. 12, *passim*]. Simply put, the opinions of Dr. Lesesne and Dr. Colier—the only medical opinions of Plaintiff's physical limitations to which the ALJ assigned significant weight—are stale.

And while it is clear that the ALJ did in fact review both MRIs, as well as notes indicating that Plaintiff had multiple injections, nerve ablation treatments, and cervical surgery, an ALJ "cannot act as both judge and physician." *Rease v. Barnhart*,

72

422 F. Supp. 2d 1334, 1374 (N.D. Ga. 2006) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992)); *id*. at n.54 ("When medical findings merely diagnose the claimant's impairments without relating those impairments to specific residual functional capacities, the Commissioner may not make that connection himself.").[34]

For all of these reasons, the undersigned finds that the ALJ failed to evaluate Plaintiff's impairments according to the proper legal standards or support her conclusions with substantial evidence. Accordingly, the matter is due to be remanded for further consideration and development of the record.[35]

---

[34] For similar reasons, the ALJ's reliance on Dr. Massey's opinion of Plaintiff mental functioning, which was issued on August 2, 2013, [R85-87], without the benefit of Dr. Rao's later opinions, the repeated diagnoses of bipolar disorder, or the record evidence showing that Plaintiff consistently complied with medication and returned for mental-health treatment, [R420-21, 449-54, 578-81, 583-85, 618, 621-26, 843-44, 849-50, 852-56], is insufficient to serve as substantial evidence of Plaintiff's mental limitations.

[35] Because the case is so clearly reversible on these grounds, the Court need not—and does not—not reach Plaintiff's other arguments.

AO 72A
(Rev.8/8
2)

## VII.  CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 26th day of March, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)